

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

05 10871 RCL

SHARON AGUILAR, §
Plaintiff §
§
V. § CASE NO.______________
MAGISTRATE JUDGE §
MUSCLETECH RESEARCH AND §
DEVELOPMENT, INC.; §
GN OLDCO CORPORATION F/K/A §
GENERAL NUTRITION CORPORATION §
Defendants §

RECEIPT # 63855
AMOUNT $ 250
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE

**PLAINTIFF'S ORIGINAL COMPLAINT**

COMES NOW, SHARON AGUILAR, Plaintiff, in the above-captioned action complaining of Defendants listed below and for cause of action would show as follows:

## I.
## PARTIES

1. Plaintiff, SHARON AGUILAR, is a resident of Lowell, Massachusetts.

2. Defendant, MUSCLETECH RESEARCH & DEVELOPMENT, INC., at all times herein mentioned, was a corporation or other business entity organized and existing under the laws of Canada. It may be served with process by serving by serving its corporate headquarters located at 5100 Spectrum Way, Mississauga, Ontario, Canada, L4W 5S2, by and through U.S. Certified Mail, return receipt requested.

3. Defendant GN OLDCO CORPORATION F/K/A GENERAL NUTRITION CORPORATION is a Pennsylvania corporation doing business in Minneapolis, Minnesota, with its principal place of business in Pittsburgh, Pennsylvania. Defendant GN OLDCO CORPORATION F/K/A GENERAL NUTRITION

CORPORATION ("GNC") may be served by serving its Registered Agent Corporation CT Corporation System, 101 Federal Street, Boston Massachusetts 02110.

## II.
## JURISDICTION & VENUE

4. Venue is proper in the District Court of Massachusetts as the matter in controversy exceeds $75,000 and complete diversity exists as the matter in controversy is between Plaintiff, a Massachusetts citizen, and Defendants, citizens of foreign states.

## III.
## FACTUAL BACKGROUND

5. At all times relevant hereto, Defendants, themselves, or by use of others, did design, formulate, manufacture, label, package, distribute, sell, advertise and otherwise distribute Hydroxycut to consumers.

6. Hydroxycut is a dietary supplement containing, among other ingredients, ephedrine, ma-huang and guarana. Ma Huang is the botanical source of ephedrine alkaloids and guarana is the botanical source of caffeine. Ephedrine is a sympathomimetic that acts directly and indirectly on the sympathetic nerves. Ephedrine stimulates the release of norepinephrine resulting in increased blood pressure, cardiac output, and central nervous system stimulation.

7. Ephedrine is structurally similar to amphetamines and when combined with guarana (caffeine), the cardiovascular risks increase. In fact, the main ingredient of methamphetamine is ephedrine.

8. Importantly, Defendants advocate the use of their ephedrine-based supplements in the context of exercise that is also a stimulant to the central nervous system. This triple dose of stimulation (ephedrine, caffeine, exercise) has lead to an

increasing number of serious injuries and deaths. Notably, there are, now, more reported cases of death, heart attacks, and strokes associated with ephedra supplements than with the prescription cold medicine Phenylpropanolamine "PPA" at the time it was removed from the market.

9. The dangerous health risks posed by ephedrine-based supplements, including Hydroxycut, are well known to the Defendants. In 1983, the Food and Drug Administration ("FDA") banned all over-the counter (OTC) drugs containing synthetic ephedrine and caffeine. In 1993, the FDA issued a warning about the safety problems of dietary supplements containing ephedrine alkaloids. In 1992 the New Mexico State Pharmacy Board banned nonprescription products that have ephedrine as the main ingredient. Ohio followed suit in 1994. In 1995 an FDA sub-committee agreed that ephedrine alkaloids can cause adverse events and the Food Advisory Committee released a statement reporting more than 330 adverse effects and 12 deaths due to ephedrine. In 1996 the Texas Department of Health reported their review of the records from 1993 to 1995 identifying 500 adverse events including 8 deaths associated with dietary supplements containing ephedrine. By 1997 at least 20 states had banned or restricted ephedrine based products. In June 1997, the FDA proposed a ban on ephedrine dietary supplements with more than 8 mg per serving and proposed a stricter labeling standard. Also in 1997 the National Collegiate Athletic Association (NCAA) banned ephedra supplements. Subsequently, the National Football League and International Olympic Committee banned these supplements. In 2000, the Haller and Benowitz article was published relating various adverse events to the use of supplements containing ephedrine alkaloids. In 2001, the Canadian government warned against the use of ephedra products.

In 2002, members of the American Medical Association urged the FDA to ban these diet aids and this same year the Army, Navy, and Air Force banned the sale of ephedrine dietary supplements. In December 2003, the FDA announced the ban of ephedra dietary supplements. This was the first dietary supplement ever to be banned by the FDA. Despite the overwhelming evidence that ephedra products posed substantial health risks, Defendants continued to manufacturer, market, sell, and distribute these supplements to unsuspecting consumers.

10. Despite the legal and administrative actions that have been filed against these Defendants, they continue to engage in harmful and irresponsible business practices by selling dangerous and unregulated diet supplements to unsuspecting consumers.

11. The toxic effects of ephedra diet supplements are not necessarily associated with massive doses. Adverse effects are variable and do not always depend on the dose consumed. Unlike prescription medications, herbal products do not have to be tested before they are sold to prove they work well and are safe. They do no not have to adhere to any standard quality controls and, unfortunately, the word "natural" means unregulated. Ephedra supplements do not contain standardized amounts and there is enormous variation from person to person in sensitivity to these products. This problem is exacerbated by the extreme variability in ephedrine content associated with different ephedra species, place of origin, and extraction procedures. Because these diet supplements are marketed and promoted as natural, consumers assume, incorrectly, that the supplements are safe and do not have side effects. In one study the total alkaloid content varied from 0% to 154% of what was claimed on the label. If such variances existed in prescription and nonprescription drugs they would never be released to the

public and yet ephedra supplements are marketed, promoted, and sold every day to unwitting consumers.

12. With the passage of the Dietary Supplement Health and Education Act of 1994 (DSHEA), ephedra-based supplements, as well as other herbal products, can be marketed without any pre-market safety evaluation by the FDA. This Act places the burden of proof on the FDA, not the manufacturer, to show that the dietary supplement presents a serious and unreasonable risk. Consumers are left to depend on self-regulation for assurance of product quality, consistency, potency, and purity. This approach is in sharp contrast to drugs that must undergo rigorous safety and efficiency standards through clinical trials before a drug can be introduced to the public.

13. Consumers, after growing accustomed to high quality prescription drugs, assume that the diet supplements they are purchasing, are also subject to the same rigorous governmental standards. Nothing in Defendants' labeling or marketing materials discloses the fact their product is not regulated. In fact, the Defendants, have, withheld from the public, all the information they have received concerning the serious side effects of Hydroxycut. Defendants' marketing and labeling do not provide consumers with the FDA's toll free number to report adverse events. Given the long history of adverse reactions to products containing ephedra, the disclosures on Defendants' label are inadequate to inform consumers of the material facts regarding the dangers of these products. Especially worrisome is the fact Defendants do not warn of the adverse reactions attributable to the other ingredients contained in Hydroxycut. Despite all of the serious side effects of these ingredients alone, and in combination with the other ingredients, Defendants do not disclose them to consumers.

14. The risks of taking Defendants' products are difficult to justify because the ephedrine alkaloids do not have demonstrated benefits. Unlike vitamins, ephedra supplements are not essential for proper nutrition. Notably, there are currently, no clinical trials that substantiate the safety or efficacy of these supplements. There is no long term benefit associated with ephedra supplements; however, there is overwhelming evidence of shorter-term risk. The risk benefit ratio is extremely unfavorable to consumers. Although ephedra accounted for less than 1% of all sales of dietary supplements, it accounted for 64% of all the adverse events.

15. In or around May 2002, Plaintiff began purchasing Hydroxycut from GNC in Wareham, Massachusetts. Plaintiff began taking the supplements in accordance with Defendants' directions that were contained on the labels.

16. On or about March 19, 2003, Plaintiff took the recommended amount of the product and shortly thereafter suffered a subarchnoid hemorrhage, seizures and a ruptured brain aneurysm. Although Plaintiff discontinued taking the products, she suffered, and continues to suffer, from serious medical problems related to her subarchnoid hemorrhage, seizures and a ruptured brain aneurysm.

17. At the time the products were purchased by Plaintiff, Defendants did not provide Plaintiff with any warnings concerning the dangerous side effects of these products. Plaintiff was totally unaware of the health hazards associated with these ephedra-based products. Had Plaintiff known that she was taking a product with dangerous side effects, she would not have purchased and used Hydroxycut.

**COUNT I**
**BREACH OF EXPRESS WARRANTY**

18. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 17 of this complaint and further alleges as follows:

19. Defendants' labels and advertising concerning these products contained express warranties about Hydroxycut's safety and efficacy. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff suffered serious injuries.

**COUNT II**
**BREACH OF IMPLIED WARRANTIES**

20. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 19 of this complaint and further alleges as follows:

21. Plaintiff's injuries and damages were caused and/or contributed to by a breach of the Defendants' implied warranty of merchantability in that Hydroxycut (a) was not of a quality fit for its intended use and purpose; (b) was not fit for the ordinary and intended use for which it was made; (c) was not distributed with adequate warnings of the risks and possible complications involved in its use; and (d) Defendants knew, or should have known, that Hydroxycut posed health hazards to consumers.

22. The injuries and damages, complained of by Plaintiff, were caused and/or contributed to by Defendants' breach of implied warranty of fitness for a particular purpose. Defendants knew, or should have known, that the consumers of Hydroxycut would use the products for an extended period of time to lose weight and that the same were unfit for such use. Defendants knew, or should have known, that their expertise and knowledge was being relied upon by Plaintiff to furnish a diet supplement that would be

reasonably safe to use. Further, Defendants knew, or should have known, that Hydroxycut was not adequately tested and posed unreasonable risks to Plaintiff and therefore were not fit for their intended use.

23. The conduct of Defendants as described herein, proximately caused or contributed to the injuries and damages sustained by Plaintiff.

24. Defendants' conduct as stated herein was fraudulent, willful and, malicious.

**COUNT III**
**NEGLIGENCE**

25. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 24 of this complaint and further alleges as follows:

26. Defendants had a duty to exercise reasonable care in the manufacture, sale and/or distribution of Hydroxycut into the stream of commerce. This duty includes the assurance that these products would not harm consumers.

27. Defendants failed to exercise ordinary care in the design, marketing, manufacturing, sale, testing, quality assurance, quality control and/or distribution of Hydroxycut. Defendants knew, or should have known, that Hydroxycut created a high risk of unreasonably dangerous side effects, including death.

28. Among other acts of negligence, Defendants: (a) failed to use due care in the design, manufacturing, marketing and sales of Hydroxycut; (b) failed to conduct adequate testing and post-market surveillance to determine the safety of Hydroxycut; (c) failed to provide adequate training to distributors concerning the appropriate use of these products; and (d) failed to warn and/or adequately warn consumers of the dangerous side effects of Hydroxycut.

29. Defendants' conduct, as stated herein, was fraudulent, willful, and malicious.

**COUNT IV**
**FRAUD**

30. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 29 of this complaint and further alleges as follows:

31. Prior to placing Hydroxycut on the market and prior to selling Hydroxycut, Defendants knew, or should have known, that Hydroxycut contained ingredients with harmful side effects.

32. Defendants failed to disclose the potential complications and risks that they knew, or should have known, were associated with the use of Hydroxycut.

33. Defendants continued to market, distribute and sell Hydroxycut as safe products even after Defendants had knowledge of the health risks associated with ephedra-based products.

34. Defendants' representatives, agents, and/or employees made material representations to the general public and to potential consumers that Hydroxycut was safe and effective. At the time the representations were made, they were false and Defendants knew they were false.

35. Defendants made a deliberate decision to withhold information concerning the side effects and risks associated with these products from the public.

36. Defendants' fraudulent conduct and misrepresentations induced Plaintiff to use Hydroxycut that directly caused or contributed to her health problems.

37. Defendants' fraudulent conduct and misrepresentations proximately caused or contributed to the injuries and damages sustained by Plaintiff.

## COUNT V
## NEGLIGENT MISREPRESENTATION

38. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 37 of this complaint and further alleges as follows:

39. Defendants individually and/or through their agents, representatives, and/or employees, negligently misrepresented or omitted to state material facts about the dangers of Hydroxycut in that they made such misrepresentations or omissions when they knew or should have known of the falsity of such representations. Alternatively, Defendants made such representations or omissions without exercising reasonable care to ascertain the accuracy of these representations.

40. The above misrepresentations or omissions were made to the public and Plaintiff. Plaintiff justifiably relied on Defendants' misrepresentations or omissions. Defendants' misrepresentations were the proximate cause of Plaintiff's damages.

## COUNT VI
## BREACH OF CONTINUING DUTY TO WARN

41. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 40 of this complaint and further alleges as follows:

42. Defendants are liable to Plaintiff for breaching their continuing duty to warn Plaintiff of adverse health effects and complications associated with Hydroxycut.

43. Defendants were involved in the manufacturing, designing, testing, marketing, distributing and/or selling of Hydroxycut. Accordingly, Defendants were involved in creating the risks associated with the product.

44. Defendants knew, should have known, or should have discovered risks associated with Hydroxycut that were the result of their manufacturing, designing, testing, marketing, distributing and/or selling.

45. Defendants had a continuing duty to warn Plaintiff. Defendants breached their duty.

46. Defendants' breach of this duty was a proximate cause of Plaintiff's injuries as set forth below.

**COUNT VII**
**CIVIL CONSPIRACY**

47. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 46 of this complaint and further alleges as follows:

48. Plaintiff brings this cause of action for civil conspiracy against Defendants because Defendants knowingly, willingly and wrongfully, combined and agreed with one another for the purposes of concealing material facts, including the serious risks associated with Hydroxycut from federal and state regulators and the public, including Plaintiff, in product packaging, labeling, advertising and promotional campaigns and materials regarding the safety and use of Hydroxycut for the purposes of continuing to sell and profit from the sale of Hydroxycut, in spite of the significant dangers of Hydroxycut. Defendants committed the above-described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of Hydroxycut.

49. Defendants joined in the conspiracy withheld and/or concealed the health risks associated with the ingestion of Hydroxycut from the public and Plaintiff.

50. Plaintiff reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Defendants regarding the nature of Hydroxycut.

51. As a direct, factual, and proximate result of Defendants' conduct and Plaintiff's reliance on Defendants' false and fraudulent representations, omissions and concealments, Plaintiff has suffered and will continue to suffer substantial injuries and damages for which she is entitled to relief.

**COUNT VIII**
**PLAINTIFF'S DAMAGES**

52. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 51 of this complaint and further alleges as follows:

53. As a direct and proximate result of Defendants' acts and/or omissions complained of herein, Plaintiff suffered, and in reasonable probability will continue to suffer in the future, the following damages: (a) mental pain and anguish; (b) medical expenses; (c) lost wages; (d) loss of earning capacity; (e) physical impairment; and (f) physical pain and anguish.

**COUNT IX**
**PUNITIVE DAMAGES**

54. Plaintiff repleads as though fully set out herein each and every allegation contained in paragraphs 1 through 53 of this complaint and further alleges as follows:

55. Plaintiff further alleges that Defendants' acts and/or omissions, as described herein, were the result of Defendants' heedless and reckless disregard of the rights of the Plaintiff. Defendants' acts and/or omissions involved such an entire want of care that when viewed objectively from the standpoint of Defendants at the time of the

occurrence in question, the acts and omissions complained of herein involved an extreme degree of risk, and Defendants had actual, subjective awareness of the risks involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff. By reason of Defendants' malice, Plaintiff seeks recovery of exemplary damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon final trial, Plaintiff has:

a. Trial by jury which is hereby demanded;

b. Judgment against Defendants, jointly and severally;

c. Prejudgment interest as allowed by law;

d. Postjudgment interest as allowed by law;

e. Actual damages;

f. Costs of suit;

g. Exemplary damages; and

h. Such other and further relief at law or in equity to which Plaintiff may be justly entitled.

Respectfully submitted,

By: ______________________
Michael S. Appel (BBO #543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
Boston, MA 02110
(617) 227-3030

Of Counsel:

ROBERT J. BINSTOCK
LINDA L. LAURENT
MICHELLE W. WAN
REICH & BINSTOCK
4265 San Felipe, Suite 1000
Houston, Texas 77027
(713) 622-7271
(713) 623-8724 Fax

DATED:

05 10871 RCL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Sharon Aguilar v. Metabolife Corporation, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

☑ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

☐ IV. 220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

☐ V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐ NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐ NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐ NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐ NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☑ NO ☐

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☑ Central Division ☐ Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐ Central Division ☐ Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐ NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Michael S. Appel, Sugarman, Rogers, Barshak & Cohen, P.C.

ADDRESS 101 Merrimac Street, Boston, MA 02114

TELEPHONE NO. (617) 227-3030

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Sharon Aguilar

**(b)** County of Residence of First Listed Plaintiff: Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Michael S. Appel, Sugarman, Rogers, Barshak & Cohen, P.C., 101 Merrimac Street, Boston, MA 02114 (617) 227-3030

**DEFENDANTS**
Muscletech Research and Development, Inc.; GN Oldco Corporation f/k/a General Nutrition Corporation

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☒ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
28 U.S.C. § 1332

Brief description of cause:
Plaintiff, as a result of ingesting Hydroxycut, suffered a subarchnoid hemorrhage, seizures & brain aneurysm.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE DOCKET NUMBER

DATE 4/27/05 SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE